United States District Court
District of Massachusetts

```
                                    )
THOMAS C. GRASSIA,                  )
           Plaintiff,               )
                                    )
      v.                            )   Civil Action No.
                                    )   07-11483-NMG
DETECTIVE THEODORE L. PIERS,        )
DETECTIVE WILLIAM F. DELANEY,       )
JOHN DOE and TOWN OF FRAMINGHAM,    )
           Defendants.              )
                                    )
```

MEMORANDUM & ORDER

GORTON, J.

Plaintiff Thomas Grassia ("Grassia") brought suit against defendants Theodore Piers ("Piers"), William Delaney ("Delaney"), alleged supervisor John Doe ("Doe") and the Town of Framingham, Massachusetts ("the Town") pursuant to the federal civil rights statute, 42 U.S.C. § 1983, for violations of the Fourth, Fifth and Fourteenth Amendments, U.S. Const., amends. IV, V, XIV, and conspiracy to violate the same. He also brings claims against the Town for supervisory and vicarious liability and against the individual defendants pursuant to various state law causes of action. Before the Court are cross motions for summary judgment.

I.    Factual Background

This case arises from the fallout after the termination of a personal relationship which ultimately led to plaintiff's arrest on charges of criminal harassment and witness intimidation.

-1-

Defendants Piers and Delaney are police officers for the Town and they were involved in a lengthy investigation of Grassia which ended with his arrest.  Grassia's fundamental complaint is that the arrest warrant should not have been sought and that the officers did not have probable cause to arrest him.

Grassia and Maureen Crocker ("Crocker") met at a gym in Framingham.  He is an attorney and she is a graphic designer. During the summer of 2001, although both were married, the two became romantically involved.  Within about one year, however, the relationship ended.  During the following two years, numerous events caused Crocker to suspect Grassia of stalking her, to fear for her safety and to seek the involvement of law enforcement. Many such occurrences indisputably involved Grassia while he was suspected by police and Crocker (although not proven) to be responsible for others.  Those events formed the basis for Piers's detailed affidavit in support of the arrest warrant and are generally described therein.  Not all of the facts and allegations are repeated here but much of the saga is unveiled.

In particular, during the two-year period after Crocker and Grassia broke up in the late summer or early fall of 2002, Crocker and Framingham law enforcement officers became aware of or were personally involved in the following incidents:

In October, 2002, Crocker began dating Scott Drohan ("Drohan") but Grassia remained enamored of her and at some point

-2-

apparently had Drohan's criminal record checked.

On Christmas Day 2002, Grassia sent flowers to Crocker's house.  One flower was silk and Grassia included a note stating that his love for her would die when the last flower did.

By early 2003, Crocker resigned her membership in the gym at which they had met and joined Gold's Gym in Natick, Massachusetts.

On February 5, 2003, Crocker reported to police that she had been receiving several harassing phone calls per day for weeks during which the caller would say nothing and hang up.

Two days later, the word "Whore" was spray-painted on her car.  Crocker thought, based upon a footprint in the snow, that Grassia was responsible and called the police to report the incident and her suspicion.

During the next month or so, Grassia sent several aggressive emails to Crocker 1) denying any involvement in the spray-painting and 2) asking Crocker to speak with him.  When she did not respond (or did so curtly), Grassia's messages became increasingly distressed.

In March, 2003, Crocker's attorney, Thomas Waldstein ("Attorney Waldstein"), sent Grassia a letter asking him not to contact Crocker directly.

Shortly thereafter, through Attorney Waldstein, Crocker received an agreement drafted by Grassia in which Drohan's name

-3-

was misspelled as "Drehan".   Crocker alleges that the same
misspelling had appeared in spray-paint on her house (a fact
about which Grassia denies any knowledge).

On April 6 and June 4, 2003, Crocker reported to police that
her home and vehicle were subject to more vandalism.   In her
deposition, she elaborated that Drohan's name was spray-painted
on the house but, this time, was spelled correctly.

In early June, 2003, Grassia emailed Crocker again
desperately asking her to see him and Attorney Waldstein again
responded that she did not want to have any contact with him.

On June 16, 2003, Crocker reported to the police that
additional obscenities had been painted on her house and car.
The reporting officer found her to be "extremely upset" and
Crocker told him that she suspected Grassia.

The next day, Piers met with Crocker and she told him about
her relationship with Grassia and his continued contact with her
despite the requests from Attorney Waldstein.   In his affidavit,
Piers stated that

> [a]lthough Ms. Crocker could not state for certain that
> Mr. Grassia was responsible for any of the damage, his
> continued contact made her more and more fearful.

At Piers's urging, Crocker sought a restraining order and
obtained a ten-day temporary order.   Grassia challenged it and,
after a hearing on June 23, 2003, the order was vacated.

In July, 2003, the plaintiff met separately with the Town's

-4-

police chief and with his assistant, Brian Simoneau ("Simoneau"), where he maintained that he was being stalked by Crocker (not vice versa) and again denied any sexual relationship with her. He also wrote letters 1) to the judge who denied the restraining order expressing his appreciation and 2) to Sergeant Michael McLaughlin ("McLaughlin") of the Sherborn Police (where the plaintiff lived) about the investigation.

On July 25, 2003, Crocker reported that her house and car were spray-painted with obscenities.

On July 30, 2003, Crocker sought another restraining order against Grassia but it was denied.

The next day, a detective from the Framingham Police Department interviewed Grassia and he denied any involvement with the vandalism but, for the first time, admitted to his prior intimate relationship with Crocker.

On August 22, 2003, Crocker reported another instance of malicious destruction of property but video surveillance equipment installed at her house had been tampered with in order to prevent filming. She subsequently discovered that the word "Whore" had been burned into her front lawn with herbicide and that someone had broken into the house.

On August 27, 2003, Crocker received a phone call, later traced to a phone booth in Worcester, Massachusetts, from a female stating that she was having Drohan's baby and threatening

-5-

to burn down her house.

That call led to interviews over the next few days with Drohan and Crocker's ex-husband, Thomas Crocker ("Thomas"). Drohan lives in New Hampshire and explained that he had a good relationship with his ex-wife and ex-girlfriend and neither would do such a thing. Thomas expressed concern about the incidents and the safety of his children at Crocker's house. Although the affidavit does not so state, it appears that the interviews left Piers satisfied that the interviewees were not responsible.

On August 31, 2003, Grassia joined the same Gold's Gym that Crocker had previously joined to avoid him, causing her greater concern. He contends that he did so because he wanted to teach certain exercise classes there.

On September 8, 2003, Crocker reported that Grassia had driven by her children while they waited for the school bus and that she feared for their safety. Grassia later called Crocker to say that he was upset that the kids would not look at him which she also reported to police.

On September 22, 2003, Crocker applied for a restraining order for the third time but was again denied. After the hearing, Piers told Grassia that any further contact with Crocker would result in a criminal harassment charge.

On Thanksgiving 2003, Crocker reported that her property had again been vandalized and that her house had a strong gasoline

-6-

smell. Although not stated in the affidavit, video surveillance apparently revealed a perpetrator with long hair and a hat but officers thought that the outfit was a disguise.

On Christmas Day, neighbors reported seeing a BMW with dark windows (which matches a description of Grassia's vehicle) pull into Crocker's driveway.

Piers's affidavit states that in early January, 2004, Grassia contacted the Sherborn police department and asked if they could call him every time Crocker made a complaint about him. The police denied his request. Grassia also stated that it was Crocker who was causing him problems (which the affidavit adamantly refutes).

On January 16, 2004, Grassia reported to the police that lug nuts were missing from his car and that, although he was not blaming Crocker, he wanted it reported. He followed up by sending the officer to whom he spoke a letter thanking him for listening and having confidence in him.

On January 25, 2004, Crocker reported that she found nails in her driveway and Piers's affidavit vaguely states that the surveillance video showed "vehicle ... observed in the area".

On February 4, 2004, Grassia (at his request) met with Delaney, Simoneau and Piers and he told them that 1) he wanted to be able to live a normal life and go places Crocker went, 2) she had ruined his life and 3) he had never lied to police about her

-7-

(a statement he promptly retracted when challenged). As was becoming customary, Grassia wrote Simoneau an appreciative letter after the meeting and enclosed a copy of his book.

Piers's affidavit states that on February 19, 2004, McLaughlin called Delaney to report that Grassia had requested a license plate check for his law firm partner, Walter Lupan ("Lupan"). McLaughlin lied about the car's owner and, in reality, it belonged to Crocker's neighbor who parked in front of her house because relatives were visiting over the weekend. Police concluded that "Grassia thought that this was possibly a new boyfriend and was trying to check up on [her]".

Delaney advised Crocker to consider moving out of the area at least temporarily but she did not heed his advice.

On February 22, 2004, Crocker received three annoying phone calls from what turned out to be a public telephone located at a gas station in Natick, Massachusetts. The Piers affidavit reports that surveillance tapes at the station showed a "vehicle fitting suspect vehicle" but Grassia contends that no concrete information was provided to support such a statement.

On March 3, 2004, the plaintiff emailed Attorney Waldstein with his intended gym schedule despite the fact that he had been discouraged from teaching classes there and, when Attorney Waldstein replied with Crocker's preexisting conflicts, Grassia declined to change his plans.

-8-

On March 22, 2004, Lupan called McLaughlin and asked him to run a license plate check for Grassia. The affidavit states that Lupan was uncomfortable and that the plates belonged to Crocker's family members who had parked in her driveway over the weekend.

Also around that time, Grassia's secretary (and now girlfriend) Barbara Carney ("Carney") drove past Crocker's house "as if looking for something", which Crocker reported to police, and went to the police station to review the log more than once.

During the spring and summer, Grassia emailed Simoneau several times with "updates" about his case and investigation.

The situation came to a climax later that summer. On July 6, 2004, a brick was thrown through the window at Crocker's office in Framingham and an explosive device was found below the window. The next day, Piers's affidavit states that Grassia appeared at the gym looking "disheveled" and stated that Crocker was causing him much anxiety.

On August 3, 2004, Crocker reported to police that she was running at 6:45 a.m. when the plaintiff, who lived in another town, drove past her on a motorcycle (a claim Grassia denies).

Around the same time, employees at Gold's Gym reported to police that 1) Grassia and a friend came into the gym and the friend asked to see a printout of when all members sign in and out (a request the employee refused) and 2) after Crocker changed her schedule to avoid morning workouts, Grassia thereafter also

came less often during the morning.

On August 5, 2004, Grassia applied for a restraining order against Crocker and a temporary order was entered. The application stated that Grassia was in imminent fear of physical harm and that he thought Crocker intended to kill him. At his deposition, however, he could not remember why he got the order and only specifically pointed to the alleged removal of lug nuts from his car eight months earlier. He had never previously reported any such fear or physical threats from Crocker to police. Grassia was told that Framingham police would serve the restraining order on Crocker and they did so that same day.

Grassia claims that he was unaware of the service because no return of service was immediately filed at the court. He nonetheless admits that he did not follow up with the police and instead took matters into his own hands. He somehow learned that Crocker had gone to Connecticut and assumed that meant that she was at her parents' house. On August 12, 2004, he sent someone to knock on her parents' door and serve her with his restraining order. Crocker called the Framingham police to report the incident and stated that Grassia's conduct put her in greater fear because it implied that he knew her whereabouts. An FBI profiler also reviewed the case and was confident that Grassia would try to meet with Crocker to have her arrested.

Piers and Delaney decided that they had seen and learned

-10-

enough.  On August 13, 2004, they filed an application for an
arrest warrant with the Framingham Division of the Massachusetts
District Court that included an application for a criminal
complaint and Piers's 13-page, single-spaced affidavit containing
a summary report of events and a detailed log of reports and
events.  The application stated that there was an imminent threat
of a crime by Grassia and detailed many of the above allegations.
An assistant magistrate judge reviewed the application and,
because Grassia was a member of the bar, asked the Clerk of
Courts to review it as well.  The Clerk agreed that issuance of
an arrest warrant was appropriate and the warrant was issued
accordingly.  Grassia was arrested at his office that afternoon.

     The following month, both charges were dismissed.  A judge
dismissed the witness intimidation charge for want of
jurisdiction and, after a hearing, found no probable cause to
charge Grassia with criminal harassment.  Grassia, of course,
agrees with both rulings and has brought this lawsuit because he
believes that he should have never been arrested in the first
place.  An internal investigation by the Framingham police has
since affirmed the officers' actions and found that there was
probable cause for Grassia's arrest.

## II.  Procedural History

     Grassia filed his complaint on August 10, 2007 and the case
then proceeded through discovery.  On April 30, 2010, Grassia

-11-

filed a motion for partial summary judgment. Defendants
responded by filing a cross-motion for summary judgment on all
counts the following month which Grassia later opposed.

## III. Analysis

### A.    Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and
to assess the proof in order to see whether there is a genuine
need for trial." Mesnick v. General Elec. Co., 950 F.2d 816, 822
(1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46,
50 (1st Cir. 1990)). The burden is upon the moving party to
show, based upon the pleadings, discovery and affidavits, "that
there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law." Fed.
R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the
suit under the governing law." Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant
or unnecessary will not be counted." Id. A genuine issue of
material fact exists where the evidence with respect to the
material fact in dispute "is such that a reasonable jury could
return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden
shifts to the non-moving party to set forth specific facts
showing that there is a genuine, triable issue. Celotex Corp. v.

-12-

Catrett, 477 U.S. 317, 324 (1986).  The Court must view the
entire record in the light most hospitable to the non-moving
party and indulge all reasonable inferences in that party's
favor.  O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).
If, after viewing the record in the non-moving party's favor, the
Court determines that no genuine issue of material fact exists
and the moving party is entitled to judgment as a matter of law,
summary judgment is appropriate.

### B.   Application

Grassia moved for summary judgment with respect to three
counts: 1) wrongful arrest without probable cause by Piers and
Delaney (Counts I and II) and 2) respondeat superior liability
for the same against the Town pursuant to M.G.L. c. 258, § 2
(Count XI).  Defendants responded with a cross motion for summary
judgment on all twelve counts.  Each is considered in turn.

### 1.   Wrongful Arrest Without Probable Cause by Piers and Delaney (Counts I and II)

If an arrest is supported by probable cause, the arrestee's
constitutional rights are not offended.  Acosta v. Ames Dep't
Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004).  Probable cause
exists

> when the arresting officer, acting upon apparently
> trustworthy information, reasonably concludes that a
> crime has been (or is about to be) committed and that the
> putative arrestee likely is one of the perpetrators.

Id.  The standard is objective and based upon the totality of the

-13-

circumstances known at the time of arrest.  Id. at 9-10

(citations omitted); Burke v. Town Of Walpole, 405 F.3d 66, 80

(1st Cir. 2005).

These guideposts afford police considerable deference.  The

determination that probable cause exists need not be "ironclad,

or even highly probable ... only ... reasonable".  Acosta, 386

F.3d at 11 (citation omitted).  Arresting or investigating

officers are not obligated to rule out all possibilities or

suspects.  See id. at 10-11; Forest v. Pawtucket Police Dep't,

377 F.3d 52 (1st Cir. 2004) (finding no constitutional violation

where officer only interviewed the victim, the victim's mother

and the school principal but not the arrestee, the teaching

assistant or other students in the class).

Qualified immunity may also protect officers from liability

in suits brought pursuant to 42 U.S.C. § 1983.  The touchstone of

qualified immunity is whether the officer's conduct was

objectively reasonable.  In the context of a wrongful arrest

claim, the First Circuit has held that 1) it is objectively

reasonable to seek an arrest warrant if the presence of probable

cause is "at least arguable" and 2) when officers make an arrest

with a warrant,

> even if probable cause is lacking, they are entitled to
> qualified immunity unless the warrant application is so
> lacking in indicia of probable cause as to render
> official belief in its existence unreasonable.

Burke, 405 F.3d at 87 (citations and quotation marks omitted).

-14-

If the existence of probable cause was "merely questionable" or in the "grey area appropriate for judicial determination", therefore, a magistrate's determination that a warrant should issue should insulate the officer. Briggs v. Malley, 748 F.2d 715, 719, 721 (1st Cir. 1984).

Grassia contends that summary judgment in his favor is warranted because Piers and Delaney had no probable cause to arrest him and no objectively reasonable officer could have found that they did. He asserts that, because he was arrested without a hearing, defendants had to establish probable cause either 1) to charge him with witness intimidation (a felony) or 2) to charge him with criminal harassment (a misdemeanor) and to find that there was an imminent threat of the commission of a crime. See M.G.L. c. 218, § 35A. Grassia maintains that no such probable cause existed and officers had no evidence that a crime was imminent and contrived the felony charge to secure his arrest without a hearing. He claims that only two specific allegations purport to link him to criminal conduct: 1) his attempt to serve his restraining order on Crocker and 2) the unsupported statement that a vehicle matching the description of his was at a gas station when annoying phone calls were made. Grassia criticizes both allegations and concludes by characterizing the case against him as "the most wretched excuse for probable cause".

With respect to qualified immunity, Grassia summarily states

-15-

that there is no basis upon which a competent officer could reasonably believe there was any nexus between him and a crime.

Defendants respond that the totality of the circumstances divulged in Piers's 14-page warrant application established probable cause for an arrest on both charges. With respect to witness intimidation, they contend that Crocker had been furnishing information to police investigating vandalism and that she was in such fear that she left Massachusetts. The entirety of the circumstances led to the determination that Grassia intended to intimidate Crocker and that probable cause existed to charge him. In any event, defendants argue, an officer standing in defendants' shoes certainly could have reasonably determined that there was probable cause to apply for an arrest warrant and thus they are entitled to qualified immunity.

In opposing defendants' cross-motion, Grassia argues that, with respect to probable cause, defendants "seek to dress sheer speculation as rational inference" and many other suspects may have been responsible for intimidating Crocker, who was

recently separated from her husband, dating a divorced man who had since had at least one other liaison and who she had met via an internet dating service.

With respect to qualified immunity, he repeats that the felony charge of witness intimidation was contrived, that Crocker never gave any evidence against him and that no conduct on his behalf kept her from doing so.

-16-

The Court will enter summary judgment in favor of Piers and Delaney because they are entitled to qualified immunity. First, however, a housekeeping matter requires attention. In his most recent filing, Grassia seeks to strike as irrelevant almost all of defendants' factual allegations about the lengthy investigation by police. He contends that the question before the Court is only whether the application was sufficient to establish probable cause for witness intimidation or whether an officer could reasonably believe that it did and, therefore, evidence of his benign conduct or of the affair is irrelevant.

Grassia's argument is unpersuasive because 1) facts about the investigation and the history between him and Crocker are clearly relevant and he provides no authority to the contrary and 2) he admits as much when he states that relevant evidence encompasses "the warrant application and any other material bearing on the reasonableness of reliance on the facts it recites." The warrant application contained 14 pages of support, including a long time line of events, and any facts not explicitly recited therein bear on the reasonableness of the officers' reliance upon what the application does provide.

The Court finds plaintiff's position on the merits to be similarly unavailing because the warrant application was not so lacking in indicia of probable cause as to render official belief in its existence unreasonable for either crime charged. The

-17-

Court need not rehash the lengthy facts presented above which formed the basis for and were generally included in the application for an arrest warrant. That application was considered by an assistant magistrate and, as an additional precaution, presented to a second official for his recommendation. This case was at least in the "grey area" and the submission to and confirmation by a judicial officer, therefore, support a finding of qualified immunity. See Briggs, 748 F.2d at 719, 721; Malley v. Briggs, 475 U.S. 335 (1986).

The Court expands, briefly, for each crime. With respect to criminal harassment, the evidence was substantial and it was certainly objectively reasonable to have concluded, as did Piers and Delaney, that probable cause existed to charge Grassia. Moreover, the application stated, based in part on a consultation with an FBI profiler, that there was an imminent risk of the commission of a crime. That claim and the reliance on it was not objectively unreasonable. With respect to witness intimidation, the warrant application indicates that Crocker was reluctant to continue providing information to police. Grassia was made aware, on several occasions, that he was the subject of a police investigation and officers believed that there was probable cause to charge him with endeavoring to intimidate the victim who was the primary source of information for that investigation. That conclusion was not objectively unreasonable.

-18-

Plaintiff's arguments to the contrary ignore most of the record and the expansive details presented in the warrant application. The majority of his argument is that probable cause was lacking to arrest him on a charge of witness intimidation. It is unclear why Grassia focuses on that charge because his opening brief admits that probable cause for his arrest could have also been established based upon a charge of criminal harassment and a finding that there was an imminent threat of the commission of a crime. See Budnick v. Barnstable Cnty. Bar Advocates, Inc., No. 92-1933, 1993 WL 93133 (1st Cir. 1993) ("[I]f there is probable cause to arrest for one crime, the seizure is not unconstitutional even if probable cause is lacking for the second crime.") (citing Barry v. Fowler, 902 F.2d 770, 773 (9th Cir. 1990)). In any event, the Court has found that it was not objectively unreasonable to seek a warrant and to arrest Grassia on both counts.

To be sure, police never had any conclusive, direct evidence that Grassia was responsible for the violent acts, property destruction or annoying phone calls. Moreover, Grassia is correct that there were other potential suspects and that Piers and Delaney did not apparently pursue them with the same voracity as they did him. The law does not, however, require such action or certainty on the part of law enforcement officers. They need not eliminate all possible suspects or explanations and they are

entitled to credit the victim in developing a probable cause theory.  E.g., Acosta, 386 F.3d at 10-11; Forest, 377 F.3d at 56-58.  In this case, Piers and Delaney investigated other potential suspects and thought that, based upon the circumstances (including numerous acts conclusively attributed to Grassia and Crocker's reports), Grassia was engaged in criminal harassment and intimidation and would imminently commit a crime.  They were entitled to make that determination and that is enough to enter summary judgment in their favor.

### 2.   Conspiracy (Count III)

Count III of Grassia's complaint states only that Piers and Delaney "conspired to deprive him of his right to be free from unlawful seizure of his person and his right to due process of law".  Defendants contend that they are entitled to summary judgment on that claim because 1) without a valid showing of an unlawful seizure, plaintiff cannot maintain a claim for conspiracy to do the same and 2) the allegations are vague and conclusory.  Grassia responds with one sentence:

> [t]he scope of Piers and Delaney's 'joint' decision to seek a warrant for Grassia's arrest would appear to comprehend a meeting of the minds for purposes of conspiracy.

The Court will enter summary judgment for the defendants. The allegation is wholly conclusory and there is no evidence of a conspiracy between Piers and Delaney to violate Grassia's constitutional rights.

-20-

### 3.   Massachusetts Civil Rights Act (Counts VI and VII)

The same qualified immunity standard that applies under 42
U.S.C. § 1983 applies to claims under the Massachusetts Civil
Rights Act, Duarte v. Healy, 537 N.E.2d 1230, 1232 (Mass. 1989),
and the Court will, therefore, allow defendants' motion for
summary judgment with respect to Counts VI and VII in light of
the previous ruling.

### 4.   Monell Liability Against the Town (Count V)

A municipality may be held liable under 42 U.S.C. § 1983 for
certain constitutional violations but not under a theory of
respondeat superior.  Instead, liability attaches when the
execution of the government's policy or custom, whether performed
by its lawmakers or by those whose acts may fairly be said to
represent official policy, inflicts the injury.  Monell v. New
York City Dept. of Social Servs., 436 U.S. 658, 692-94 (1978).
Where liability is premised on a municipality's alleged failure
to train or supervise its employees, liability will attach only
if "the failure to train amounts to deliberate indifference to
the rights of persons with whom the police come into contact".
City of Canton v. Harris, 489 U.S. 378, 388 (1989).

Count V of Grassia's complaint alleges liability under such
a theory because 1) the Town had a policy and practice of
inadequately supervising, overseeing, disciplining, controlling
or training its police officers to prevent them from abusing the

-21-

power of arrest and 2) the wrongful arrest and related activities by Piers and Delaney were a direct result of the Town's deliberate indifference in that regard.

The Town argues that Grassia has not shown (and cannot show) that any policies contributed in any respect to an unconstitutional arrest. Grassia responds that the Framingham Police Department and its Chief exonerated the officers and testified that they acted in accordance with department policies and, therefore, there is enough evidence to support the inference that such policies were the moving force behind his unlawful arrest.

Grassia's argument and his complaint are again conclusory and the Court will enter summary judgment for the Town. There is no evidence of any Town policy or practice, carried out with deliberate indifference, to fail to train its officers not to abuse their arrest powers. The fact that Grassia feels he was wrongfully arrested in no way establishes such a policy or practice or that a decisionmaker with authority to represent the Town was the moving force behind his arrest.

### 5.   Vicarious Liability Against the Town (Count XI)

Count XI is a claim for vicarious liability against the Town. Grassia argues that summary judgment should be entered in his favor because, pursuant to M.G.L. c. 258, § 2, the Town is liable for negligent or wrongful acts of its employees and "there

-22-

can be no question that [Piers and Delaney] acted negligently at the least". Moreover, he asserts, even if the Town was found not liable because the officers' conduct was intentional, the ratification of their actions by officials was negligent.

The Town responds that, although Grassia's complaint makes no mention of M.G.L. c. 258 or negligence, he nonetheless cannot state a claim under that statute because it exempts municipalities from liability for intentional torts including false arrest. M.G.L. c. 258, § 10(c). Grassia retorts that he is not seeking to hold the Town liable for intentional misconduct but merely negligent acts.

The Court will enter summary judgment in the Town's favor. Even assuming that Grassia's claim under M.G.L. c. 258, § 2 is cognizable, he provides no evidence that the Town acted negligently. Instead, he summarily states as much based upon his contention that Piers and Delaney acted so egregiously that they must have been negligent. Such a conclusory mode of argument is insufficient and the Court disagrees for reasons already stated.

## 6. Malicious Prosecution (Count IX)

To make out a valid claim for malicious prosecution, Grassia must show that Piers and Delaney "instituted criminal proceedings against [him] with malice and without probable cause and that those proceedings terminated in [his] favor". E.g., Correllas v. Viveiros, 572 N.E.2d 7, 10 (Mass. 1991). To raise a genuine

-23-

issue of material fact on the question of malice, Grassia must

> come forward with some evidence that would permit a fact
> finder to conclude that [Piers and Delaney] (1) knew
> there was no probable cause, and (2) acted with an
> improper motive ... , i.e., acted primarily for a purpose
> other than that of properly adjudicating the claim.

Sklar v. Beth Israel Deaconess Med. Ctr., 797 N.E.2d 381, 387

(Mass. App. Ct. 2003).

The Court will allow defendants' motion for summary judgment
on this count because Grassia provides no evidence of malice.
His single, conclusory statement that "[m]alice may be inferred
from the totality of circumstances, and in particular the
conjuring of a felony charge so as to accomplish the
arrest" is entirely speculative and does not meet the standard
laid out in Sklar.

### 7.  Remaining Claims (Counts IV, VIII, X and XII)

In his opposition to defendants' motion, Grassia concedes
that his claims for false imprisonment, intentional infliction of
emotional distress and violation of the Massachusetts Public
Records Law should be dismissed.  Moreover, he does not respond
to defendants' contention that Count IV against John Doe should
be dismissed.  Accordingly, summary judgment will be entered for
defendants on the remaining counts.

## ORDER

In accordance with the foregoing,

1) plaintiff's motion for partial summary judgment (Docket No. 23) is **DENIED**; and

2) defendants' cross motion for summary judgment (Docket No. 34) is **ALLOWED**.

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated August 3 , 2010